[Crim. No. 41813. Second Dist., Div. Five. Apr. 6, 1983.]

In re MIKEAL D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MIKEAL D., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Ernest Martinez, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HASTINGS, J.**—The issues presented in this appeal are:

(1) Did the juvenile court have jurisdiction to modify a previous order of wardship based upon acts committed after appellant was over 18 years of age, and for which he had been tried and sentenced as an adult?

(2) Assuming that the juvenile court had jurisdiction, was commitment to the California Youth Authority (hereafter Youth Authority or CYA) an abuse of discretion?

(3) Was appellant entitled to additional custody credit for time spent in various facilities at the direction of the juvenile court?

FACTS

Appellant, not as yet over the age of 21, has a long history of juvenile court contact. Most of these contacts stemmed from sexually related problems involving young girls.[1] He was first adjudged to be a ward of the juvenile court at age 11, and has continued in that status until the present time. The incidents giving rise to the present petition are as follows:

[1]At the time of the incidents giving rise to the supplemental petition involved here, appellant was on probation by virtue of a previously sustained petition on February 29, 1980. In January 1980, appellant had made several bomb threats, stating that he had placed bombs at the fire station and two elementary schools in Simi Valley. He had also been making annoying phone calls to Doreen S., the owner of a leotard store. Appellant came into her store to buy some leotards and asked if Mrs. S. or her six-and one-half year old daughter could come into the dressing room with him.

When appellant was apprehended, he had in his possession a page of questions regarding women's clothing. Appellant indicated he used the questions to make obscene phone calls. The questions included the following: "What size panties do you wear? Are you wearing any now? Could I have you or your daughter in the dressing room with me? Could I dress your daughter in a leotard and tights? Necking, petting, Frenching, 69, masturbating, possible intercourse—."

On March 30, 1981, 11-year-old Janna S. received a telephone call from appellant who said he wanted to photograph for Young Athlete magazine. He asked Janna if she would pose in the nude, doing the splits. Later that same day, Janna's mother, Judy, received another call from appellant which she tape-recorded. He continued his conversation about Young Athlete magazine and asked if there were other young girls in Janna's baton class who were interested in being photographed.[2]

Three days before, on March 27, 1981, appellant had called the S. residence and spoken with Yvonne R., age 12. He told Yvonne that he was making uniforms for girls in her baton class and asked what size bra and panties she wore. Yvonne eventually responded with the requested information and appellant then asked if she ever went without underwear and asked her to describe her breasts. When Yvonne did not respond, appellant told her he would make her an extra uniform at no cost if she did not tell anyone about the call. He told her he would bring the uniforms to her home. Yvonne told her parents about the incident, and since Mrs. R. was in charge of making the uniforms, she decided the call was "spurious" and called police.

Investigator Patricia Cullen of the Simi Valley Police Department discovered that appellant had been given a list of all the baton twirlers' names and phone numbers while working on a publicity campaign at the Mirror Newspaper.

At the time these incidents occurred, appellant was just under 19 years of age. He was arrested, plead nolo contendere to a charge of violating Penal Code section 647a (annoying or molesting a child under 18), and served 120 days of a 180-day sentence in the Ventura County jail.

On October 14, 1981, a supplemental petition was filed in juvenile court alleging that appellant had violated his juvenile court probation by virtue of his conviction in municipal court. The petition further alleged that appellant had "continued to demonstrate . . . severe psycho-sexual problems and should be considered for a specialized Youth Authority commitment for treatment." While the supplemental petition was pending, appellant made several more phone calls. On October 28, 1981, he made a call to Mrs. Jan L. He had previously called Mrs. L. on May 18, 1981, and identified himself as an employee of Montgomery Ward in Canoga Park. He told her the store was having a sale on children's clothes and, upon finding that Mrs. L. had a 10-year-old

---

[2]Judy S. told the probation officer that she had previous dealings with appellant, "primarily of a professional nature," beginning in 1978. An exception to this was a call she received from appellant in May or June, 1980. Appellant said he was organizing a sex education class in which he and his girl-friend would demonstrate as much sexual information as possible with the exception of actual intercourse, and that the children would be able to participate. Judy S. told appellant she was not interested and hung up.

daughter, questioned her as to whether her daughter wore leotards, panties and training bra. Mrs. L. became suspicious and contacted Wards, only to find out that there was no such sale and no employees were authorized to make such an offer. In a subsequent call, appellant asked Mrs. L. if her daughter would be interested in learning about sex because he could refer her to a group where this would be possible. Mrs. L. hung up on appellant. In two calls during October, appellant again identified himself as a representative of Montgomery Wards, and told Mrs. L. that Wards was giving away girls' clothes.

On October 30, 1981, appellant called Betty P., again stating that he was a representative of Montgomery Ward. He told Mrs. P. he was aware that she provided child care and Wards had an excess of children's clothes which it wanted to give child care providers. Appellant asked about ages and sizes of the children and also asked numerous questions about their underwear.

The May and October calls resulted in the filing of a four-count complaint in Ventura Municipal Court on November 4, 1981, alleging that appellant had violated Penal Code section 653m, subdivision (b) (making a telephone call with the intent to annoy another and without disclosing his true identity). The juvenile court supplemental petition was amended on November 11, 1981, to reflect these incidents.

The adjudication hearing on the amended supplemental petition was held on December 23, 1981, and appellant admitted the allegations of the petition. He subsequently admitted the allegations of the municipal court complaint and on January 12, 1982, he was sentenced by that court to 360 days in county jail.

The disposition hearing on the supplemental petition was held on January 13, 1982, the day after appellant was sentenced in the municipal court. The juvenile court determined that it should retain its jurisdiction over appellant, and appellant was committed to the Youth Authority for a period not to exceed three years, five months, with credit given for time spent in county jail.

### DISCUSSION

■ 1. The first issue which we must resolve is whether the juvenile court relinquished its jurisdiction over appellant by allowing him to be twice convicted and sentenced as an adult, and to serve one of those sentences in the county jail. Appellant contends that this case is controlled by *In re Dennis J.* (1977) 72 Cal.App.3d 755 [140 Cal.Rptr. 463], while respondent urges us to follow *In re Larry T.* (1978) 77 Cal.App.3d 969 [144 Cal.Rptr. 43], and *In re Donald B.* (1979) 89 Cal.App.3d 804 [152 Cal.Rptr. 868].

The facts of *Dennis J.* are as follows: Dennis was made a ward of the juvenile court after the court sustained two petitions charging him with possession of marijuana and burglary. Before disposition on those two petitions, yet another

petition was filed in which it was alleged that Dennis had committed the crimes of rape, burglary and robbery. In connection with the third petition, a hearing was held pursuant to Welfare and Institutions Code section 707, and Dennis was found to be unfit for handling by the juvenile court. The district attorney then filed an information charging Dennis with rape, robbery and burglary; he pled guilty to second degree robbery and the remaining charges were dismissed. He was placed on three years probation on the condition that he serve one year in the county jail.

In disposing of the first two petitions, the juvenile court found that Dennis was still amenable to rehabilitation with respect to the earlier crimes, and it committed him to the Youth Authority. Thus, Dennis was faced with a Youth Authority commitment which could extend beyond his three-year superior court probation period. Dennis appealed from this dispositional order, and the Court of Appeal reversed, stating:

"[O]n September 3, 1976, the juvenile court determined that at that point in his life Dennis had ceased to be a person who could be rehabilitated and that the public could not be adequately protected . . . by any of the dispositional options available to that court, which options included commitment to the Youth Authority. . . . He then passed to the jurisdiction of the adult court.

"Following the sentencing by the superior court on the conviction for robbery, the juvenile court made the order which is now under review and, in effect, found that Dennis was still amenable to rehabilitation for the offenses he previously had committed. That order appears to us to be totally inconsistent with the prior order finding him unfit. The minor is a single person and cannot be subdivided into two or more parts according to the offenses committed.

". . . . . . . . . . . . . . . . . . . . . .

"In exercising its jurisdiction the juvenile court cannot treat and rehabilitate a part of the minor while leaving another part to the rehabilitation processes of the regular criminal justice system. Either the juvenile court or the adult criminal court must deal with the whole individual." (72 Cal.App.3d at p. 760.)

*Dennis J.* stands for the proposition that "once a juvenile court determines a minor is not amenable to treatment under the juvenile court system as to some crimes, he cannot be held under the jurisdiction of the juvenile court for treatment as to other crimes." (*People* v. *Superior Court (Woodfin)* (1982) 129 Cal.App.3d 970, 975 [129 Cal.Rptr. 970].) The *Woodfin* court, following *Dennis J.*, held that the trial court erred in finding that the minor was amenable to

treatment as a juvenile on some counts of a multicount indictment, but could be tried as an adult on other counts.

In both *Larry T.* and *Donald B.*, we distinguished *Dennis J.* because, unlike *Dennis J.*, there had never been a determination that the minors were unfit for treatment as juveniles. That crucial distinguishing factor is absent here as well. Appellant, though under the supervision of the juvenile court, was subject to adult court prosecution for crimes committed past the age of majority. (1 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) § 1.2.) Appellant was charged in criminal court solely because of his age (*In re Larry T., supra,* 77 Cal.App.3d at p. 972) and not, as in *Dennis J.*, because he had been found unfit for treatment as a juvenile. (Welf. & Inst. Code, § 707.) The court, although aware of the commitment to county jail, felt that jail time could not "offer to Mike the kind of assistance and the kind of help that not only Mikeal needs, but in the long-run, what the community needs," and that "the only possibility of assisting Mikeal . . . would be a commitment to the California Youth Authority."[3] Unlike *Dennis J.*, the court never made a determination that appellant "had ceased to be a person who could be rehabilitated" by the juvenile court. (*In re Dennis J., supra,* 72 Cal.App.3d 755, 760.) In fact, the court's comments indicate that it felt otherwise.

Appellant argues that since he could have asked for and almost automatically received a finding of unfitness solely on account of his age (*Rucker* v. *Superior Court* (1977) 75 Cal.App.3d 197 [141 Cal.Rptr. 900]), the lack of such finding here is insignificant. The practical effect of appellant's suggestion would be to extend *Rucker* to the point where a fitness hearing (Welf. & Inst. Code, § 707) would be unnecessary for any ward over the age of eighteen who found himself in adult court. Since this would require a change in existing statutory law, appellant's argument would be better directed to the Legislature.

The court here conceded that the probation department had acted less than efficiently in this case by waiting until after appellant's jail sentence had run its course before bringing a supplemental petition.[4] However, the question is whether the probation department's tardiness served to deprive the juvenile court of its jurisdiction over appellant. Appellant contends that it did, but we cannot agree. In order for the juvenile court to relinquish jurisdiction in a case of this type, the juvenile court must make a determination, as it did in *Dennis*

---

[3]The court's comments reveal another factor which distinguishes this case from *Dennis J.* In *Dennis J.*, the Court of Appeal was convinced that the trial court's order committing Dennis to the Youth Authority was "penal in nature and the result of the juvenile court's dissatisfaction with the sentence imposed by the superior court in the adult proceeding." (72 Cal.App.3d at p. 761.) Here, it is obvious that the court was concerned not with whether appellant would receive adequate punishment, but whether he would receive adequate help.

[4]The court pointed out, however, that this had not really worked to appellant's detriment since the jail sentence was credited against the length of the Youth Authority commitment.

*J.*, that "the minor is not a fit and proper subject to be dealt with under the juvenile court law." (Welf. & Inst. Code, § 707.) "Here, in contrast, no such determination was ever made. The only reason for [appellant] being charged in the superior court was that at the time of his latest crime he had passed his eighteenth birthday." (*In re Larry T., supra,* 77 Cal.App.3d 972.) We therefore hold that because no finding of unfitness was made or requested in this case, the juvenile court did not relinquish its jurisdiction over appellant.

■ 2. The jurisdictional question aside, appellant contends that commitment to the Youth Authority was itself an abuse of discretion because (1) there was no evidence that the court considered less restrictive alternatives, including camp community placement, and (2) appellant did not meet the criteria and guidelines for Youth Authority placement. (*In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65].)

Appellant's first point is clearly without merit. Appellant's association with the juvenile court began when he was 11-years-old. During the period of appellant's wardship, several "less restrictive alternatives" to CYA placement had been tried without success.[5] Appellant's supervising probation officer referred to appellant as a "sexual time bomb which, if not diffused, could explode in any direction." The officer who prepared the most recent probation report was of the opinion that appellant had exhausted all of the local programs available through the juvenile court:

"This young man has had every opportunity to avail himself of the community resources to resolve his problems, and remain free.

"For whatever reason he remains a nuisance, a bane to mothers of young children, or any women with a phone. The Court has the option to release the minor home on probation however, this has been tried numerous times in the past even to the point of telling him he was going to be committed to the California Youth Authority, suspended.

"Yet here the minor appears before the Court one more time, accused not of one violation of probation, but rather with several allegations and after a lengthy incarceration for one of these allegations.

"In the face of the minor's actions this office can offer no program for the minor's rehabilitation, other than a commitment to the California Youth Authority. It is hoped that they will be able to provide and obtain the minor's

---

[5]These included periods of treatment in Camarillo State Hospital, Palmdale General Hospital and the Samaritan Outreach Program in San Diego, as well as extensive outpatient therapy when appellant was placed on probation in the care of his parents.

cooperation in a therapy program which we at the local level have been unable
to find."

■ Here, the court made the requisite finding (Welf. & Inst. Code, § 734)
that Youth Authority commitment would be of probable benefit to appellant.
The court stated that it was aware that psychiatric services were available at
CYA and it would inform the Youth Authority of its opinion that the authority
allow appellant to avail himself of these services. Yet, appellant claims that this
finding of probable benefit is unsupported by substantial evidence because he
comes within each of three categories which are deemed inappropriate for CYA
placement: "(1) *youths who are dependent or primarily placement problems
. . .*; (2) *unsophisticated, mildly delinquent youths,* 'for whom commingling
with serious delinquents who make up the bulk of the Youth Authority popula-
tion might result in a negative learning experience and serious loss of self-
esteem'; and (3) *mentally retarded or mentally disturbed youths,* 'for whom the
probable benefits of treatment exceed those of programs within the Youth
Authority. The Youth Authority has no programs for the mentally retarded nor
psychiatric treatment for the mentally ill.' " (*In re Aline D., supra,* 14 Cal.3d at
pp. 564-565 (italics in original).)

The crucial difference between appellant and *Aline D.* is that Aline was com-
mitted to the Youth Authority despite the *expressed doubt* of the juvenile court
referee that she would benefit from such commitment. Here, the court,
although it was "not convinced" that CYA commitment would cure appellant
of his problems, expressed an affirmative belief that such commitment would
be of some benefit. Appellant was not committed to the Youth Authority
because there was nowhere else to send him, but because CYA would provide
appellant with "the kind of help he needs." This is consistent with the purpose
of the Juvenile Court Law, which is rehabilitation rather than punishment. (*In
re Michael R.* (1977) 73 Cal.App.3d 327 [140 Cal.Rptr. 716].)

Supporting his argument that he is an "unsophisticated, mildly delinquent
youth,"[6] appellant likens himself to Carrie W. (*In re Carrie W.* (1979) 89
Cal.App.3d 642 [152 Cal.Rptr. 690]), a 15-year-old unwed mother who had
exhibited no assaultive behavior but who had indiscriminately placed numerous
long distance phone calls and then refused to pay for them. The court was of the
opinion that these phone calls merely constituted "impulsive behavior" and
CYA commitment was inappropriate. Appellant's behavior hardly comes
within this category, since his long involvement with the juvenile court resulted
from a severe psychosexual problem including assaultive behavior and vic-
timizing young children.

---

[6]We find it hard to reconcile appellant's fear of being locked up with hardened criminals in the
Youth Authority with his prior argument that he should have been sent to county jail.

Appellant's argument that the Youth Authority is not equipped to deal with mentally disturbed youths like himself was answered by the court in *In re Jesse McM.* (1980) 105 Cal.App.3d 187 [164 Cal.Rptr. 199]: "The situation differs from that which existed in *In re Aline D.* . . . in two crucial aspects: here the Youth Authority commitment was not based solely upon the lack of alternative placements, but also upon the court's belief that Jesse would benefit from such placement; and whatever may have been the case when *In re Aline D.* was decided, the testimony in this case shows that the Youth Authority now has a program designed to meet the needs of mentally disturbed minors such as Jesse." (105 Cal.App.3d at p. 193.)

The record in this case supports the court's decision in favor of Youth Authority commitment. It is obvious that some type of incarceration was in order, since appellant's behavior abated only when he was incarcerated, but the court also felt compelled to make one last try at helping appellant within the juvenile court system. The Youth Authority commitment accomplished both of these objectives.

■ 3. Appellant's last contention relates to predisposition confinement credits. The issue arose as follows:

Appellant was given credit against his maximum period of confinement for time spent in various juvenile facilities on previously sustained petitions, as well as for any time he spent in county jail. He claims he should also receive credit for the time he spent in Camarillo State Hospital, Palmdale General Hospital and the Samaritan's Outreach Program (Sam's Ranch) in San Diego. The Attorney General argues that appellant was not entitled to credit for time spent in these facilities, and further contends that he should not have received any credit for the time he spent in jail. Thus, according to the Attorney General, the amount of appellant's confinement credits should actually be reduced.

It is well settled that minors are entitled to have their maximum period of confinement reduced by any predisposition time spent in "physical confinement." (*In re Eric J.* (1979) 25 Cal.3d 522 [159 Cal.Rptr. 317, 601 P.2d 549].) However, time spent in a "nonsecure placement" does not count against the maximum period of confinement. (*In re Harm R.* (1979) 88 Cal.App.3d 438 [152 Cal.Rptr. 167].) The question here is whether or not the time appellant spent in Camarillo and Palmdale hospitals and at Sam's Ranch can be considered "physical confinement."

Welfare and Institutions Code section 726 defines physical confinement as "placement in a juvenile hall, ranch, camp or secure juvenile home pursuant to Section 730, or in any institution operated by the Youth Authority." Section 730, to which section 726 refers, provides that when a minor is adjudged a

ward of the court under section 602 (delinquent minors), "the court may order any of the types of treatment referred to in Section 727, and as an additional alternative, may commit the minor to a juvenile home, ranch, camp or forestry camp." Section 727, which applies to both 601 (dependent) and 602 (delinquent) wards, permits the court to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of such minor, including medical treatment, subject to further order of the court." These include facilities such as foster homes, boarding homes and facilities operated by public agencies or private organizations for the care and treatment of such minors. *In re Harm R., supra,* 88 Cal.App.3d 438, held that commitments under section 727 did not constitute "physical confinement."[7] (88 Cal.App.3d at p. 442.) The Samaritan Outreach program (Sam's Ranch) involved here is obviously one of these facilities, and under *Harm R.* appellant would not be entitled to commitment credit for time spent there.

The same rationale applies to appellant's stays in Camarillo and Palmdale hospitals, the purpose of which, judging from the reports provided by those facilities, was "medical treatment" of the type contemplated by section 727.

Appellant is, however, entitled to confinement credit for the time he spent in county jail. The Attorney General argues that under Welfare and Institutions Code section 726, "physical confinement" means only a "juvenile hall, ranch, camp, secure juvenile home or any institution operated by the Youth Authority" and therefore appellant is not entitled to credit for any time spent in jail because it is not a facility listed in that section. This argument is unpersuasive, since there is hardly anything more physically confining than jail. Such a result would be especially unfair here, since appellant was confined in county jail for the same conduct upon which the supplemental petition was based.

The order of wardship is affirmed.

Feinerman, P. J., and Stephens, J., concurred.

---

[7]Harm R., after placement, had run away from various group homes, a facility called "Dahmer's Ranch," and (three times) the Boys' Republic.